UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

GREGORY ASGAARD,

                     Plaintiff,

v.

COUNTY OF MARQUETTE, SHERIFF'S DEPUTY
SAMANTHA GERBER, SHERIFF'S DEPUTY
ANNE BODA, ~~SHERIFF'S DEPUTY JACOB~~
~~GLASS~~, ~~SHERIFF'S DEPUTY BENJAMIN WOOTKE~~,
SHERIFF'S DEPUTY JEFFREY GIROUX, and
SHERIFF'S DEPUTY DAHLSTROM,

                     Defendants.

_____/

Case No 20-cv-153

Hon. Hala Y. Jarbou

| ERIC STEMPIEN (P58703) | GREGORY R. GRANT (P68808) |
|---|---|
| STEMPIEN LAW, PLLC | CUMMINGS, MCCLOREY DAVIS & |
| Attorneys for Plaintiff | ACHO, PLC |
| 38701 Seven Mile Road, Suite 130 | Attorneys for Defendants |
| Livonia, MI 48152 | 310 West Front Street, Suite 221 |
| (734)744-7002 | Traverse City, MI 49684 |
| eric@stempien.com | (231) 922-1888; Fax (231) 922-9888 |
| Legal Assistant: shawn@stempien.com | ggrant@cmda-law.com |

_____/

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ........................................................................................ 3

INTRODUCTION .................................................................................................... 5

STATEMENT OF FACTS ......................................................................................... 5

ARGUMENT ......................................................................................................... 12

   I.    STANDARD OF REVIEW ........................................................................ 12

   II.    QUALIFIED IMMUNITY ..................................................................... 12

   III.    DEFENDANTS WERE DELIBERATELY INDIFFERENT TO PLAINTIFF'S MEDICAL NEEDS, VIOLATING HIS EIGHTH AMENDMENT RIGHTS. THUS, DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. ................................................................................... 13

     A.  Plaintiff's Risk of Fall was Obvious to a Lay Person, and Thus, He Meets the Objective Component of His Deliberate Indifference Claim. ........................... 14

     B.  Plaintiff Did Not Fail to Establish the Subjective Component Against Defendant Deputies. ........................................................................................ 15

     i.   Giroux ...................................................................................... 17

     ii.   Dahlstrom ................................................................................. 20

     iii.   Boda ........................................................................................ 20

     iv.   Gerber ..................................................................................... 21

     C.  Defendant Deputies Are Not Entitled to Qualified Immunity Because Their Actions Violated Clearly Established Law. ................................................... 21

   IV.    Plaintiff Did Not Fail to Establish a Municipal Liability Claim Against Defendant County of Marquette. ................................................................. 22

   V.   Defendant Deputies Are Not Entitled to Governmental Immunity from Plaintiff's State-Law Gross Negligence Claims. ........................................................ 23

CONCLUSION ..................................................................................................... 24

## **INDEX OF AUTHORITIES**

### *Cases*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………….……..………..15

*Blackmore v Kalamazoo Cnty.*, 390 F.3d 890 (6th Cir. 2004)…………………16, 17, 18, 27

*Briggs v. Oakland Co.*, 742 N.W.2d 136 (Mich. App. 2007)…………………………………29

*Brown v. Bargery*, 207 F.3d 863 (6th Cir. 2000)……………………………………………...19

*Celotex v. Cattrett*, 477 U.S. 317 (1986)………………………………...…………………..14

*Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001)…………………….……………17, 18, 20

*Craig ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296 (Mich. 2004)………….…………30

*Dominguez v. Correctional Medical Services*, 555 F.3d 543 (6th Cir. 2009)………………………………………………………………….....16, 17, 20, 27

*Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690 (6th Cir. 2006)……………….…………..27

*Everson v. Leis*, 556 F.3d 484 (6th Cir. 2009)……………………..………………………...15

*Farmer v. Brennan*, 511 U.S. 825 (1994))…………………………………………17, 19, 20

*Grabow v. County of Macomb*, 580 Fed. Appx. 300 (6th Cir. 2014)………………………………………………………….…….21, 22, 23, 24, 25

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)…………………………………………15, 26

*Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653 (6th Cir. 1994)……………….………19

*Lemarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001)…………………………………………..20

*Matsushita Elect. Ind. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)………………..……...14, 15

*Monell v. Department of Soc. Servs.*, 436 U.S. 658 (2018)………………….………………27, 28

*Olmetti v. Kenty County, et al.*, No. 1:20-cv-395, 2020 WL 7777970 (W.D. Mich. Dec. 31, 2020)………………………………………………………………………17, 23, 24, 25

*Ouza v. City of Dearborn Heights*, 969 F.3d 265 (2020)………………………………………..27

*Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005)……………………………16, 27

*Rafferty v. Trumbull County, Ohio*, 915 F.3d 1087 (6th Cir. 2019)…………………..…..14

*Smith v. Perkins Bd. of Educ.*, 708 F.3d 821 (6th Cir. 2013)…………….…………………14

*Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560 (6th Cir. 2013)……………….....15

*T.S. v. Doe*, 742 F.3d 632 (6th Cir. 2014)…………………………..……………...16

*Turner v. City of Taylor,* 412 F.3d 629 (6th Cir.2005)……………….……………….…18

*Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392 (2010)……………..……………….....28

## ***Statutes***

42 U.S.C. § 1983……………………………………………………………………………16

MCL §691.1407(8)(a)………………………………………………………………….29

## INTRODUCTION

Defendant County of Marquette's ("Marquette County) jail detained Plaintiff Gregory Asgaard ("Asgaard") in late-April 2019. On April 25, 2019, he was booked, and later that night, he was provided his bunk assignment. Prior to his bunk assignment, Asgaard told Defendant Samantha Gerber ("Gerber"), Defendant Anne Boda ("Boda"), Defendant Jeffrey Giroux ("Giroux"), and Defendant Dahlstrom ("Dahlstrom") (collectively "Defendant Deputies") that he has PTSD and needed a lower bunk due to his night terrors and thrashing. Each Defendant Deputy denied Asgaard's request, however, and Asgaard was assigned to an upper bunk anyway. In the early morning of April 27, 2019, Asgaard did in fact thrash in his sleep and fell from his assigned upper bunk. He fell approximately 5-6 feet onto the hard surface floor, landing on his face and head Asgaard's fall resulted in him being knocked unconscious, perfuse bleeding, facial fractures, scarring, and treatment for blood-filled sinus cavities. Asgaard continues to have issues with his sinuses becoming infected because of the fall.

On August 21, 2020, Plaintiff filed this instant action with counts of violation of the Eighth and Fourteenth Amendments against all Defendants and gross negligence against named Defendant Deputies based on the acts more thoroughly outlined below.

## STATEMENT OF FACTS

### Plaintiff's Veteran Status and Post-traumatic Stress Disorder

Plaintiff is a Navy veteran who worked as a clinical psychologist for both the Navy and Veteran Affairs over a span of approximately ten years. *Exhibit 1, Asgaard Dep. Tr. 12-13*. He received a bachelor's degree from Northern Michigan University and went on to receive a master's degree from Eastern Michigan University and a PhD from Southern Illinois University. *Exhibit 1,*

*Asgaard Dep. Tr. 20*. Asgaard obtained a license to practice psychology. *Exhibit 1, Asgaard Dep. Tr. 26*.

Following his studies and licensure, *Exhibit 1,* Asgaard served in the Navy from 2010 through 2014 and was honorably discharged. *Exhibit 1, Asgaard Dep. Tr. 13; Exhibit 2, Bates 1*. He worked as the ship psychologist on the USS Abraham, where he indirectly experienced combat. *Exhibit 1, Asgaard Dep. Tr. 14-15*. Asgaard testified, "Gun ships ten feet away from you, and constant treatment of sailors and Marines as they come in and out of Afghanistan, just treating accidents. So, that's considered indirect. It's similar to, like, a drone pilot, you know, they see things, but they're not actually there on the ground." *Exhibit 1, Asgaard Dep. Tr. 15*. In further elaboration, Asgaard stated, "So, they would frequently do middle of the night flyovers, and come very close with these little boats that have guns attached to them, you know, many of them at the time." *Exhibit 1, Asgaard Dep. Tr. 15*. Because of the action Asgaard experienced, he was diagnosed with post-traumatic stress disorder ("PTSD"), alcoholism, and heart arrythmia. *Exhibit 1, Asgaard Dep. Tr. 16, 19, 27*. A symptom of Asgaard's PTSD is nightmares and thrashing in his sleep. *Exhibit 1, Asgaard Dep. Tr. 30*.

After his honorable discharge from the Navy, Asgaard worked for the Vet Center in Green Bay, Wisconsin before he secured a position in his hometown of Marquette, Michigan. *Exhibit 1, Asgaard Dep. Tr. 20-21*. Because of Asgaard's alcoholism, however, he lost his job in Marquette and spent time in Marquette County Jail. *Exhibit 1, Asgaard Dep. Tr. 22-23*.

### Plaintiff's Arrest in Late April 2019

Asgaard was arrested in the Marquette County in late April 2019. When Asgaard was arrested, he was placed in an observation cell, where his PTSD and sleep thrashing caused him to roll off the sleeping arrangement onto a bunk mate below him. *Exhibit 1, Asgaard Dep. Tr. 37-38,*

*40-41, 47*. Once Asgaard received a cell assignment and was brought into general population, he told Defendant Deputies that he has PTSD and needed a lower bunk due to his nightmares and thrashing. *Exhibit 1, Asgaard Dep. Tr. 32-34, 41-44, 47*. In fact, before Asgaard fell, he wrote in his journal, "tried help, not enough," showing his concerns and communication with Defendant Deputies regarding his needs. *Exhibit 1, Asgaard Dep. Tr. 36.* Asgaard uses stream of consciousness in his journaling, and he also wrote "try help" and "sleep," further evidencing his concerns. *Exhibit 1, Asgaard Dep. Tr. 37.*

As a compromise, Asgaard suggested he be moved to a different upper bunk that had one edge against the wall to reduce his chances of falling in his sleep. *Exhibit 1, Asgaard Dep. Tr. 55; Gerber Dep. Tr. 36*. Like his request for a lower bunk, Defendant Deputies ignored his pleas. *Exhibit 1, Asgaard Dep. Tr. 55*. Gerber claims she offered Asgaard a cot, to be placed on the floor. Gerber testified that Asgaard he refused the cot. *Gerber Dep. Tr. 36*. Asgaard unequivocally testified that Gerber's offer of a cot did not happen. *Exhibit 1, Asgaard Dep. Tr. 55-56*. In fact, Asgaard had no reason to refuse a cot because after his accident, he slept on one for the remainder of his stay in jail. *Exhibit 1, Asgaard Dep. Tr. 57-58, 60*.

Defendant attempts to obscure the dates and times of events in its brief, but the records from Marquette County Jail clearly indicate the timeline as follows:

- On April 25, 2019 at 8:56a.m., Asgaard was booked on bond revocation, and was provided his bunk assignment later that night at 11:29p.m. *Exhibit 3, Bates 57*.

- On April 26, 2019 at 8:48 a.m., Asgaard left the facility with an officer and returned at 9:38a.m. *Exhibit 3, Bates 55-56*. Later that day, the jail received notice of Asgaard's bond. *Exhibit 3, Bates 54*.

- On April 27, 2019 at 12:16a.m., Asgaard's fears were realized as he fell from his bunk as a result of his PTSD and night thrashing. *Exhibit 3, Bates 53*.

- The record indicates that at 12:22a.m. Defendants Boda and Gerber moved Asgaard to the booking room to obtain vitals. *Exhibit 3, Bates 52*.

- At 6:59p.m. on April 27, 2019, the evening after Asgaard fell, the record indicates that Giroux and Dahlstrom were off duty. *Exhibit 3, Bates 43*.

Defendant claims Asgaard's fall occurred during his first night in the jail, but the record clearly indicates that he was provided his bunk assignment the night of April 25, and he fell in the early morning of April 27. Clearly, this was the second night he was in the jail.

Defendant further indicates that it was unaware of Asgaard's PTSD based on its medical intake form. Marquette County's medical intake form is a pre-programmed questionnaire where inmates answer either yes or no for each question and deputies type in additional information if the inmate answers yes. *Exhibit 4, Giroux Dep. Tr. 10; Exhibit 5, Gerber Dep. Tr. 15-16*. Gerber admitted that having a full understanding of an inmate's medical condition is important when housing them at the Marquette County Jail, yet Defendants' medical form does not request information regarding any mental health conditions other than depression and suicide. *Exhibit 5, Gerber Dep. Tr. 38; Exhibit 3, Bates 78-79*. Gerber further testified that there is no process for assigning bunks. *Exhibit 5, Gerber Dep. Tr. 17*. Thus, it follows that even if Defendants knew of Asgaard's PTSD and night thrashing, it still would not have utilized Asgaard's medical information to give him a different bunk assignment.

**<u>Plaintiff's Conversations with Deputy Defendants</u>**

**<u>*Giroux*</u>**

Asgaard testified that he told Giroux, "I said, I'm having issues with PTSD, and so, I hope there's a bunk, and if I – that's it on the lower level, because if I got on top bunk, I'll fall." *Exhibit 1, Asgaard Dep. Tr. 50*. In response, Giroux said, "I've been here 20 years, and nobody's ever – and many people have said before that they're going to fall, and they have PTSD, but nobody ever does." *Exhibit 1, Asgaard Dep. Tr. 51*. Giroux testified he had no recollection of the event or Asgaard discussing his PTSD and need for a lower bunk. *Exhibit 4, Giroux Dep. Tr. 7-9*. According to Giroux, he was not present at work the night of the accident and did not hear about it until the next day. *Exhibit 4, Giroux Dep. Tr. 8*. Giroux, however, did admit to handling intake in late April 2019, which corresponds with Asgaard's testimony that Giroux took him into the elevator. *Exhibit 4, Giroux Dep. Tr. 9; Exhibit 1, Asgaard Dep. Tr. 50*. In Defendants' further attempt to blur the timeline, it claims Asgaard could not have discussed his PTSD with Giroux because he was working days. As the timeline clearly indicates, however, Asgaard was in the jail for most of the day of April 26, 2019, and his fall occurred that night. *Exhibit 3, Bates 55-57*. Accordingly, Giroux was available during the day of April 26 for Asgaard to have communicate his concerns with his bunk arrangement.

**<u>*Dahlstrom*</u>**

Regarding communicating his needs to Dahlstrom, Asgaard testified that he told her:

I have PTSD and I thrash around, and I'm going to fall, I already fell once when I was upstairs in observation, and that the news is on, the national news, and the ship that I was on, the exact same ship, the USS Abraham Lincoln, was in the exact same place, doing the same mission that I was, on that day and the day before, and I said so I'm – it's a big, big time trigger for me, and I'm having an issue with nightmares and night terrors, and I'm going to fall and I need to be transferred to a bottom bunk. <u>And she said, nobody's moving</u>, you know, there's nothing I can do, and <u>I know you've been asking all night, nobody's moving, plain and simple</u>.

*Exhibit 1, Asgaard Dep. Tr. 49* (emphasis added). Dahlstrom claims she has no recollection of Asgaard or having a conversation with him. *Exhibit 6, Dahlstrom Dep. Tr. 7-8.* Dahlstrom further testified that she was on day-shift assignment of 7:00a.m. to 7:00 p.m. in April of 2019. *Exhibit 6, Dahlstrom Dep. Tr. 9.* Like its argument regarding Giroux, Defendants claim Asgaard could not have discussed his PTSD with Dahlstrom because she was working days. Again, however, Asgaard was at the jail for most of the day on April 26. *Exhibit 3, Bates 54-57.*

### *Boda*

To Defendant Boda, Asgaard said, "I said I can't be up here. I told the other guards, and I'm having issues with night terrors and thrash around, and I'm going to fall." *Exhibit 1, Asgaard Dep. Tr. 53.* Boda ignored Asgaard's statements and did not respond to him. *Exhibit 1, Asgaard Dep. Tr. 53.* Boda claims Asgaard never spoke to her before he fell, but she was on staff the night of Asgaard's accident. *Exhibit 7, Boda Dep. Tr. 8-9, 14; Exhibit 3, Bates 52.*

### *Gerber*

Finally, Asgaard told Gerber he could not be on the top bunk, and Gerber responded, "nobody's moving. I talked to the lieutenant and sergeant, and nobody's moving… lieutenant said nobody's moving." *Exhibit 1, Asgaard Dep. Tr. 54.* Corroborating Asgaard's testimony, Gerber testified that she remembers Asgaard "saying that he had issues when he was sleeping, he was afraid of falling out of his bunk." *Exhibit 5, Gerber Dep. Tr. 35.* Boda further admitted that Asgaard spoke to Gerber regarding his PTSD. *Exhibit 7, Boda Dep. Tr. 13.* In fact, Gerber was aware Asgaard suffered from PTSD and night terrors. *Exhibit 5, Gerber Dep. Tr. 35.*

### **Plaintiff's Fall and Resulting Medical Issues**

Asgaard's fears were realized when he fell from the top of his assigned upper bunk. Asgaard's accident resulted in being knocked unconscious for approximately five minutes,

perfused bleeding, face fractures, scarring, and treatment for blood-filled sinus cavities. *Exhibit 1, Asgaard Dep. Tr. 60-61, 69; Exhibit 3, Bates 120-23*. When Asgaard fell, EMS was called, and he was rushed to the hospital. *Exhibit 5, Gerber Dep. Tr. 27*.

Asgaard's fall has resulted in monthly sinus infections where he has sustained antibiotic treatments as well as a traumatic brain injury. *Exhibit 1, Asgaard Dep. Tr. 62-63, 69*. Because of Asgaard's traumatic brain injury, he has trouble maintaining attention, working quickly, finding the correct words, staying organized, and remembering short-term memories. *Exhibit 1, Asgaard Dep. Tr. 69*. Following his accident, Asgaard was taken to the hospital for 6-8 hours before he was discharged back into the jail. *Exhibit 1, Asgaard Dep. Tr. 59*. After returning to the jail, one inmate stated that Asgaard falling "sounded like a truck or a bowling ball coming through the wall." *Exhibit 1, Asgaard Dep. Tr. 81*. Another inmate said he was going to have nightmares from it, and multiple inmates stated they heard Asgaard telling the Defendant Deputies that he has PTSD. *Exhibit 1, Asgaard Dep. Tr. 81-82*. In his journal, Asgaard jotted down, "Fall, nightmares, some, asked many, Drew, Boda, Gerber, Dahlstrom… nobody's moving." *Exhibit 1, Asgaard Dep. Tr. 82*.

After Asgaard returned to the jail, Defendant Deputies continued to deliberately disregard Asgaard's needs, such as when he asked for tissue for his bleeding sinuses. *Exhibit 1, Asgaard Dep. Tr. 84*. Instead of assistance, Defendant Deputies threatened to return Asgaard to observation where, "All you get is a blanket, and it's loud all hours of the night. I mean, it can be crowded downstairs. So, the cops are bringing in people, yelling all night long, and you're in there with people who are withdrawing from drugs and alcohol." *Exhibit 1, Asgaard Dep. Tr. 84, 88, 90*.

11

## ARGUMENT

### I.   STANDARD OF REVIEW

Defendants bring this motion pursuant to Federal Rule of Civil Procedure 56. Summary judgment is properly granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c). Where a reasonable jury may return a verdict for the party opposing the summary judgment, such an entry is not warranted. *Rafferty v. Trumbull County, Ohio*, 915 F.3d 1087, 1093 (6th Cir. 2019); *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013).

To avoid summary judgment, the opposing party must elicit enough evidence on the record as would permit a reasonable jury to find for it at trial. *Matsushita Elect. Ind. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where reasonable minds may differ as to the significance of the evidence, a verdict should not be directed. *Id*. The moving party retains the burden of showing an absence of evidence to support the non-moving party's case. *Celotex v. Cattrett*, 477 U.S. 317, 322 (1986). The court must consider the evidence in the light most favorable to the non-moving party but may juxtapose competing inferences. *Matsushita*, 475 U.S. at 588.

The relevant inquiry becomes whether the evidence presents enough of a disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### II.   QUALIFIED IMMUNITY

Pursuant to the Supreme Court, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is a legal question for the Court to resolve. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009), citing *Elder v. Holloway*, 501 U.S. 510, 516 (1994). When resolving a governmental employee's assertion of qualified immunity, the court determines (1) whether the facts the plaintiff has alleged or shown establishes the violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the incident. *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013), citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may examine the two prongs in any order, depending on the facts and circumstances of the case. *Id*. at 567-68.

Once the qualified immunity defense is raised, the plaintiff bears the burden of demonstrating both that the challenged conduct violates a constitutional or statutory right and that the right was so clearly established at the time that "'every reasonable officer would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014), quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Although a prior case need not be directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. For the foregoing reasons, Defendants are not entitled to summary judgement under a qualified immunity defense.

### III. DEFENDANTS WERE DELIBERATELY INDIFFERENT TO PLAINTIFF'S MEDICAL NEEDS, VIOLATING HIS EIGHTH AMENDMENT RIGHTS. THUS, DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Under the Fourteenth Amendment, a defendant's deliberate indifference to the plaintiff's serious medical needs suffices for a claim under 42 U.S.C. § 1983. *Owensby v. City of Cincinnati*, 414 F.3d 596, 602 (6th Cir. 2005); *see also Blackmore v Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004); *see also Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009), citing *Estelle v. Gamble*, 429 U.S. 97 (1976). For such a claim to be cognizable, "a prisoner must

13

allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Id.*

A constitutional claim for deliberate indifference contains both an objective and a subjective component. *Dominguez*, 555 F.3d at 550. The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Id.*, citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A medical need meets the "sufficiently serious" criterion if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the need for a doctor's attention. *Blackmore*, 390 F.3d at 897. "'Deliberate indifference' normally arises in the Eighth Amendment context, but the 'Due Process Clause of the Fourteenth Amendment operates to guarantee [Eighth Amendment protections] to pretrial detainees. *Olmetti v. Kenty County, et al.*, No. 1:20-cv-395, 2020 WL 7777970, quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005). Defendants are not entitled to summary judgment because there is, at the very least, a question of fact regarding whether their acts were deliberate and indifferent.

### A.  Plaintiff's Risk of Fall was Obvious to a Lay Person, and Thus, He Meets the Objective Component of His Deliberate Indifference Claim.

The objective component of an Eighth Amendment claim requires the plaintiff to allege facts showing that the medical need at issue is "'sufficiently serious.'" *Comstock*, 273 F.3d at 702, quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Under Sixth Circuit precedent, "where a plaintiff's claims arise from an injury 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention' . . . it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Blackmore*, 390 F.3d at 899-900 (6th Cir. 2004) (internal citation omitted); *see Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 382 n.3 (6th Cir. 2004). A prisoner's

14

"psychological needs may constitute serious medical needs…" *Comstock,* 273 F.3d. at 703. The Sixth Circuit has found that "[w]hile the right to medical care for serious medical needs does not encompass the right 'to be screened correctly for suicidal tendencies,' we have long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock,* 273 F.3d at 702.

Here, Defendants argue that the objective component is not met because "there is no evidence that Asgaard exhibited a tendency to fall or posed a strong likelihood of a fall due to or arising from his mental health diagnoses." ECF No. 29 PageID.166. Defendants are clearly mistaken, however. Like the finding in *Comstock*, Asgaard likely was not entitled to be correctly screened for PTSD and resulting issues, but Defendant Deputies were alerted to Asgaard's serious medical needs and were under an obligation to offer care. First, Defendant Deputies had notice of Asgaard's tendency to thrash and fall in his sleep because Asgaard had fallen just two nights prior while in observation. Second, each Defendant Deputy subjectively knew of that need. Asgaard's frequent verbal insistence to Defendant Deputies during the day immediately prior to his fall alerted them of his need. "[T]he question is whether the average person would easily recognize— whether from observing the person or being *told* of his symptoms—that the plaintiff's condition needed treatment. *Gunther v. Castineta*, 561 F. App'x 497, 500 (6th Cir. 2014) (emphasis added). A layperson aware of Asgaard's PTSD and night terrors, as Defendant Deputies were, would easily conclude an upper bunk posed a serious medical risk to him. Accordingly, Defendants are not entitled to summary judgment.

### B.  Plaintiff Did Not Fail to Establish the Subjective Component Against Defendant Deputies.

Under the subjective component, the Sixth Circuit requires a plaintiff to show "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867

(6th Cir. 2000), citing *Farmer*, 511 U.S. at 834. Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Also, deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. *Id*. at 835-836; *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). Thus, under Sixth Circuit precedent, a plaintiff must demonstrate "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703.

Officers, however, may "not escape liability if the evidence showed that [they] merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist. *Farmer*, 511 U.S. at 843 n. 8. And "'a prisoner is not required to show that he was literally ignored by the staff' to prove [deliberate indifference], only that his serious medical needs were consciously disregarded." *Lemarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001).

Because government officials are not usually willing to readily admit the subjective component of this test, it may be "demonstrat[ed] in the usual ways, including inference from circumstantial evidence" that could lead a factfinder to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Dominguez*, 555 F.3d at 550, citing Terrance supra 286 F.3d 834; s*ee also Philips v. Roane Cnty.*, 534 F.3d 531, 540 (6th Cir. 2008); *Comstock*, 273, F.3d at 703.

16

### *i.      Giroux*

In Defendants' Brief, Giroux argues he was not working at the time Asgaard made the statements to a deputy in the elevator. Again, Defendant clearly obscures the timeline in an attempt to remove Giroux's liability. The records from Marquette County Jail clearly show that Asgaard was given his bunk assignment on the night of April 25, he was in the jail for most of April 26, and he fell from the bunk in the early morning of April 27. *Exhibit 3, Bates 54-57.* This timeline supports both Asgaard's and Giroux's testimony that Giroux handled intake in late April 2019 and that Giroux took him on the elevator. *Exhibit 4, Giroux Dep. Tr. 9; Asgaard Dep. Tr. 50*.

Giroux relies on *Grabow v. County of Macomb* to support his contention that Giroux's level of interaction with Asgaard was insufficient to allow Giroux to infer a risk of injury. 580 Fed. Appx. 300 (6th Cir. 2014). First, *Grabow* is not binding on this Court. Second, the interaction between the officers and the plaintiff in *Grabow* is completely dissimilar to the instant case.

In *Grabow*, the defendant officers, Franks and Puchovan, established a "good to go" system for suicide intake screening of inmates. *Id*. at 303. Puchovan worked as the initial intake officer, and Franks worked at the computer stations behind the front window as the computer booking officer. *Id*. Puchovan would ask the inmate variations of three of the required screening questions: "(1) Have you been to this jail previously?; (2) Have you ever attempted suicide?; and (3) Do you feel like you want to hurt yourself now?" *Id*. at 304. If the inmate answered "no" to the last two questions, Puchovan informed Franks that the inmate was "good to go" and not a suicide risk. *Id*. Franks would then complete the computerized intake form and assign the inmate to general population without directly interviewing the inmate. *Id*. If the inmate answered "yes" to either of Puchovan's final two questions, Franks would place the inmate on observation, again without further inquiry. *Id*. When the *Grabow* plaintiff arrived, Puchovan and Franks employed their "good

17

to go" system, where the plaintiff answered no to all three questions. *Id*. Franks did not speak to the plaintiff "at any time between when [the plaintiff] arrived at the jail and when Franks's shift ended." *Id*.

After the plaintiff's intake, she met with the jail nurse. *Id*. The plaintiff told the nurse of her prior diagnoses of depression and bipolar disorder as well as present feelings of hopelessness and her previous suicide attempt. *Id*. The nurse placed the plaintiff on detox protocol but did not place her under suicide watch. *Id*. at 305. The next day, Franks was again working as the intake officer, and he testified that he moved the plaintiff to a holding cell with bunks. *Id*. During that move, the plaintiff appeared to be in good spirits and was making jokes. *Id*. The next day, while Franks was not working, the plaintiff committed suicide. *Id*.

The plaintiff's estate brought an action against Franks for deliberate indifference. *Id*. The trial court held that Franks lacked subjective knowledge of a substantial risk of the plaintiff committing suicide or to any causal connection between Franks' actions and the plaintiff's eventual suicide. *Id*. at 306. The Sixth Circuit affirmed the trial court's holding, finding Franks' interactions with the plaintiff "insufficient to create a genuine issue of material fact regarding Franks's subjective knowledge of [the plaintiff's] suicide tendencies." *Id*. at 310.

Clearly *Grabow* is completely dissimilar to the instant case. Here, Asgaard testified that he told Giroux, "I'm having issues with PTSD, and so, I hope there's a bunk, and if I – that's it on the lower level, because if I got on top bunk, I'll fall." *Exhibit 1, Asgaard Dep. Tr. 50*. Unlike the plaintiff in *Grabow*, Asgaard was not friendly and making jokes. Instead, Asgaard was informing Giroux of serious concerns regarding his mental health. Rather than taking Asgaard's concerns seriously, Giroux responded with indifference, stating, "I've been here 20 years, and nobody's

ever – and many people have said before that they're going to fall, and they have PTSD, but nobody ever does." *Exhibit 1, Asgaard Dep. Tr. 51.*

Instead, this case is like *Olmetti v. Kent Cnty.*, which this Honorable Judge decided on December 31, 2020. No. 1:20-cv-395, 2020 WL 7777970 (W.D. Mich. Dec. 31, 2020). In *Olmetti*, the plaintiff, Olmetti, was detained at defendant Kent County Correctional Facility ("KCCF") pending a criminal charge. *Id*. at *1. Olmetti was an older man who suffered from a variety of physical ailments and had previously received a lower bunk based on his poor health. *Id*. The deputy defendant, Sherwood, wrote an order to discontinue the plaintiff's lower bunk detail. *Id*. Olmetti fell from the top bunk and suffered serious injuries, including fractured ribs. *Id*. The plaintiff brought a charge for deliberate indifference against Sherwood, alleging that he "repeatedly made it known to Defendants and the corrections staff that he had severe back problems; that he had previously been assigned to lower bunk details while at KCCF; and again needed a lower bunk detail because of his serious back problems." *Id*. at *2. Accordingly, this Honorable Judge found:

> Drawing all inferences in favor of Plaintiff, Sherwood's actions in light of this knowledge constitute deliberate indifference rather than mere negligence. According to the allegations, Sherwood knew of and disregarded an excessive risk to Olmetti's health and safety. She did nothing to mitigate that known risk. Olmetti has alleged enough to satisfy the subjective element of a deliberate indifference claim.

*Id*. at *3.

Similarly, drawing all inferences in favor of Asgaard, Giroux's actions in light of his knowledge of Plaintiff's PTSD, nightmares, and night thrashing constitute deliberate indifference. Accordingly, Giroux knew and disregarded an excessive risk to Asgaard's health and safety, and he did nothing to mitigate that known risk. Thus, he is not entitled to summary judgment.

### ii. *Dahlstrom*

Again, Dahlstrom claims she was not on duty when Asgaard told a deputy about his PTSD and fears of falling. The timeline, however, clearly indicates otherwise. Dahlstrom, like Giroux, relies on *Grabow* to claim the interaction between her and Asgaard was insufficient to establish a culpable state of mind. Again, however, *Grabow* is dissimilar to the instant case because, unlike Asgaard, the *Grabow* plaintiff never communicated her diagnoses or suicide attempt to Franks. Franks only communication with the *Grabow* plaintiff was when he transferred her to her bunk, and she was in a good mood and making jokes.

Instead, the instant case is like *Olmetti*. Asgaard, like Olmetti, explicitly informed Dahlstrom of his mental illness and risk of harm. Asgaard told Dahlstrom that he has PTSD and that he thrashes around. He further stated that he was going to fall because his PTSD was triggered at the moment due to the news. Dahlstrom, however, acted with deliberate indifference, stating, "nobody's moving, you know, there's nothing I can do, and I know you've been asking all night, nobody's moving, plain and simple." *Exhibit 1, Asgaard Dep. Tr. 49*. Accordingly, Dahlstrom clearly had subjective knowledge of Asgaard's potential risk of injury, and she disregarded it. Accordingly, she is not entitled to summary judgment.

### iii. *Boda*

Boda claims that she did not talk to Asgaard prior to his fall. *Exhibit 7, Boda Dep. Tr. 8-9, 14*. Asgaard, on the other hand, testified that Boda ignored him when he told her that he could not stay on the upper bunk and that he was having night terrors and thrashing around. *Exhibit 1, Asgaard Dep. Tr. 53*. At the very least, Boda's and Asgaard's testimony produces a question of fact regarding whether Boda knew of a substantial risk to Asgaard. Consequently, Boda is not entitled to summary judgment.

### iv.    Gerber

According to Gerber, she did not disregard the potential risk to Asgaard's health because she contacted a supervisor about moving him.  Gerber continues, claiming "[c]ourts have granted summary judgment to corrections officers under similar circumstances, finding that the subjective intent element is not met where the corrections officer notifies a supervisor."  ECF No. 29, PageID.171.  Gerber cites to one case from the Western District of Kentucky.  Clearly, "courts" have not found the subjective intent element in similar circumstances, but a single trial court in Kentucky found the subjective intent not met in one instance under completely different facts.  The Kentucky case is not binding on this Court, and a trier of fact may find that Gerber did not do enough for Asgaard, showing deliberate indifference.  Consequently, taking the evidence in the light most favorable to Asgaard, there is a question of fact regarding whether Gerber acted with deliberate indifference.

### C.  Defendant Deputies Are Not Entitled to Qualified Immunity Because Their Actions Violated Clearly Established Law.

Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Because Plaintiff has clearly met the objective and subjective components of an Eighth Amendment violation, Defendant Deputies are not entitled to qualified immunity. Despite Defendants' contention, a case does not need to be directly on point. Instead, existing precedent has placed the question beyond debate that when an officer has both objective and subjective knowledge of an inmate's medical needs and he deliberately disregards those needs,

21

he has violated the Eighth Amendment. *See Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005); *see also Blackmore v Kalamazoo Cnty.*, 390 F.3d 890 (6th Cir. 2004); *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543 (6th Cir. 2009).

## IV. Plaintiff Did Not Fail to Establish a Municipal Liability Claim Against Defendant County of Marquette.

A municipal policy that causes a plaintiff's constitutional injury may serve as the basis for § 1983 liability. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286 (2020), citing *Brown v. Shaner*, 172 F.3d 927, 930 (6th Cir. 1999). To hold a municipality liable under § 1983, a plaintiff "must prove that the municipality's policy or custom caused the alleged injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006), citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690–91 (2018); *see also Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) ("The plaintiff must 'demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'").

According to the Sixth Circuit, a plaintiff must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [his] particular injury was incurred due to the execution of that policy" to hold a municipal defendant liable. *Turner v. City of Taylor,* 412 F.3d 629, 639 (6th Cir.2005) (internal quotation marks and citation omitted). A "custom" must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell,* 436 U.S. at 691. "If a person has suffered no constitutional injury at the hands of the [municipality's] officer, the fact that the [policy, practice, or custom] might have authorized the [conduct] is quite beside the point." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 404 (2010), quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Here, Asgaard has clearly established he suffered a constitutional injury at the hands of Defendant Deputies. Moreover, Asgaard established that Marquette County had an established

custom of deliberate indifference regarding an inmate's mental health beyond that of depression or suicide. Marquette County's medical intake form completely fails to request any information regarding an inmate's mental health beyond suicide or depression. *Exhibit 3, Bates 78-79*. Further, Marquette County has an established custom of having no reasonable process for assigning bunks. *Exhibit 5, Gerber Dep. Tr. 17*. Marquette County arbitrarily assigns bunks with no discretion regarding an inmate's medical history.  Accordingly, a reasonable juror could conclude that Marquette County's customs resulted in deliberate indifference toward Asgaard's mental health and risk of injury. Thus, Marquette County is not entitled to summary judgment.

## V.   Defendant Deputies Are Not Entitled to Governmental Immunity from Plaintiff's State-Law Gross Negligence Claims.

Under Michigan's Government Tort Liability Act, "each officer and employee of a governmental agency… is immune from tort liability for an injury to a person… in the course of employment or service… while acting on behalf of a governmental agency if… [t]he officer's… conduct does not amount to gross negligence that is the proximate cause of the injury or damage." MCL §691.1407(2). "Gross negligence," as used in the statute, is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL §691.1407(8)(a). "The determination whether a governmental employee's conduct constituted gross negligence that proximately caused the complained-of injury under MCL 691.1407 is generally a question of fact, but, if reasonable minds could not differ, a court may grant summary disposition." *Briggs v. Oakland Co.*, 742 N.W.2d 136, 139 (Mich. App. 2007), citing *Tarlea v. Crabtree,* 687 N.W.2d 333, 338 (Mich. App. 2004).

Defendants argue Asgaard's negligence claim fails for two reasons: (1) the evidence fails to demonstrate that any Defendant acted with a reckless and substantial lack of concern, and (2) Asgaard cannot establish that any Defendant Deputy's conduct was the proximate cause of his

injuries. Defendants, however, are clearly mistaken in both arguments. First, there is, at the very least, a question of fact regarding whether the evidence demonstrates conduct so reckless as to demonstrate a substantial lack of concern whether an injury results. As discussed above, Defendants either told Asgaard no one was moving, did not believe him, or completely ignored his requests. Thus, a reasonable juror could conclude that Deputy Defendants' conduct was grossly negligent.

Second, reasonable minds could differ regarding whether Defendant Deputies' conduct was the proximate cause of Asgaard's injuries. According to the Michigan Supreme Court:

> "Proximate cause" is a legal term of art that incorporates both cause in fact and legal (or "proximate") cause…. The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences.

*Craig ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 309 (Mich. 2004). Asgaard meets the proximate cause element because the consequences of Defendant Deputies denying Asgaard a lower bunk were completely foreseeable. In fact, Asgaard told Defendant Deputies what was likely to occur if he was not provided a lower bunk. Furthermore, Asgaard had previously fallen while in observation. Thus, Defendant Deputies are not entitled to summary judgment on Asgaard's state law claims of gross negligence.

## **CONCLUSION**

For the reasons stated above, this Honorable Court should deny Defendants' Motion for Summary Judgment.

STEMPIEN LAW, PLLC

*/s/ Eric Stempien*
Eric Stempien (P58703)
Dated: September 3, 2021                Attorney for Plaintiff