UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GREGORY ASGAARD,

Case No.   2:20-cv-00153

      Plaintiff,

Hon.  Hala Y. Jarbou
U.S. District Judge

  v.

COUNTY OF MARQUETTE, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R&R) addresses Defendants' motion for summary judgment.   (ECF No. 29.)

Plaintiff Gregory Asgaard served as an officer in the U.S. Navy from 2010 to 2014.   (ECF No. 29-3, PageID.254.)   He worked as a psychologist and provided psychological services to sailors and Marines onboard the U.S.S. Abraham Lincoln, which is an aircraft carrier, while the carrier was deployed to the Persian Gulf and the Indian Ocean.   (*Id.*, PageID.255.)   Asgaard asserts that he developed post-traumatic stress disorder (PTSD) after his military service.   (*Id.*) And he says that he has PTSD nightmares, which cause him to thrash around while sleeping.   (ECF No. 1, PageID.3.)

Asgaard brings this lawsuit pursuant to 42 U.S.C. § 1983.   (ECF No. 1.) Asgaard became a pre-trial detainee in the Marquette County Jail on April 25, 2019,

1

after he was arrested.   (*Id.*, PageID.3.)   Asgaard says that he informed several Marquette County Sheriff's Deputies of his PTSD and nightmares and asked for a lower bunk assignment because he would fall off the top bunk during the night.   (*Id.*, PageID.3-4.) He says that the Deputies ignored his requests and placed him in an upper bunk.   (*Id.*, PageID.4.)

Asgaard asserts that, during the early morning hours of April 27, 2019, he experienced a nightmare that caused him to fall out of the upper bunk to the concrete floor.   He says he suffered multiple facial fractures and a traumatic brain injury because of this fall.   (*Id.*)

Asgaard asserts that four Marquette County Sheriff's Deputies – Deputies Gerber, Boda, Giroux and Dahlstrom[1] – were deliberately indifferent to his serious medical need for a lower bunk, in violation of Eighth and Fourteenth Amendments to the U.S. Constitution.[2]   Asgaard also asserts that the Deputies' actions rose to the level of gross negligence under Michigan law.

Asgaard also sues Marquette County, Michigan, asserting that the County had a "custom, policy and practice of forcing pre-trial detainees to sleep where assigned, without regard to medical need."   (*Id.* PageID.5.)   He says this custom, policy and

---

[1]    *See* ECF No. 28 (order granting stipulation dismissing two other Sheriff's Deputies).)

[2]    Although the Eighth Amendment provides a *convicted prisoner* the right to be free from cruel and unusual punishment, it is the Due Process Clause of the Fourteenth Amendment that provides the same protections to *pre-trial detainees*. *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (citing *Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016)).

practice was the moving force behind the deliberate indifference that caused him harm.[3]   (*Id.*)

Defendants have filed a motion for summary judgment.   (ECF No. 29.) Defendants argue that they are entitled to qualified immunity as to Asgaard's deliberate indifference claims.   (*Id.*, PageID.162.) Defendants begin this argument by analyzing the facts of the case in the context of the requirements of the Eighth Amendment, i.e. whether a genuine issues of fact remain regarding the objective and subjective components of Asgaard's deliberate indifference claim.   (*Id.*, PageID.166-71.)   Then, in the context of their qualified immunity claim, Defendants argue that the actions of the Deputies did not violate clearly established law.   (*Id.*, PageID.171-72.)   Defendants also argue that the County should be dismissed because Asgaard has failed to establish a genuine issue of fact regarding the County's *Monell* liability. (*Id.*, PageID.172-73.)   And finally, Defendants argue that Asgaard's state-law gross negligence claims against the Deputies must be dismissed because the Deputies are entitled to governmental immunity.   (*Id.*, PageID.174-75.)   Defendants' overarching argument is that the evidence before the Court demonstrates that the individual Deputies were unaware of Asgaard's need for a lower bunk and that Asgaard failed to establish that they acted with deliberate indifference to a serious medical need.

---

[3]      Plaintiff's theory is that the County is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), in which the United States Supreme Court held that municipalities could be subject to Section 1983 actions for alleged constitutional violations, albeit in a narrow set of circumstances.

Asgaard asks the Court to deny Defendants' motion.   He presents a series of statements he said he made to the individual Deputies to apprise them of his condition.   (ECF No. 33, PageID.334-35, 342-46.)   He says that he has presented evidence creating a genuine issue of fact with regard to his deliberate indifference claim against each individual Deputy and, as a result, that the Deputies are not entitled to qualified immunity.   Asgaard also says that the evidence shows that the County had a policy of assigning bunks without consideration of an inmate's medical history.   (*Id.*, PageID.348.)

It is respectfully recommended that the Court grant Defendants' motion, in part, by dismissing Marquette County because Asgaard has failed to show that the County has an unconstitutional policy, procedure, or custom in denying pre-trial detainees bunk assignments based upon medical needs.   It is also recommended that the Court dismiss Deputy Boda because the record fails to establish that she acted with deliberate indifference toward Asgaard.

It recommended that the Court deny the motion in part because genuine issues of material fact exist as to whether Deputies Giroux, Dahlstrom, and Gerber acted with deliberate indifference or with gross negligence toward Asgaard's need for a bottom bunk.

## II.   Additional Factual Allegations

Asgaard was incarcerated in the Marquette County Jail on April 25, 2019, after he violated his bond arising out of a pending criminal charge in the Marquette County Circuit Court. (ECF No. 1, PageID.3.)   At the time Asgaard was booked into the jail,

he had a blood alcohol level of .054 percent with visible signs of withdrawal.   (ECF No. 29-2, PageID.237-238.)   Asgaard provided extensive information to the Marquette County Jail during the booking process.   (*Id.*, PageID.237-41 (intake form).)   Of note, he informed the booking officer that he was being treated by a mental health care professional for PTSD.   (*Id.*, PageID.238-239.)   Asgaard also stated he had high blood pressure, heart arrythmia, and asthma.   (*Id.*, PageID.239.) When asked if he had any other problems that the officer should know about, Asgaard said he took the antihistamine Cetrizine[4] and did not report any other problems. (*Id.*, PageID.240.)

Asgaard says that he informed each of the Defendants that he has PTSD and nightmares dating back to his Navy Service which cause him to thrash about in his sleep.   (ECF No. 1, PageID.4.)   After Asgaard says he told Defendants that he might fall out of a top bunk if he were to have a PTSD nightmare, he was assigned to an upper bunk and told no lower bunk beds were available and "no one is moving."   (*Id.*) Asgaard says he then asked for an upper bunk along a wall because there would be a chance that he would roll into the wall instead of onto the floor, but Defendants also refused that request.   (*Id.*)   Asgaard says that he was never offered any alternative to an upper bunk bed.   (*Id.*)

As noted in the introduction, during the early morning hours of April 27, 2019, Asgaard experienced a PTSD nightmare that caused him to roll off his bed and strike

---

[4] Cetirizine is an antihistamine used to relieve allergy symptoms.   Cetirizine Oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing - WebMD

5

the concrete floor in the jail.   (*Id.*)   Asgaard says that suffered multiple facial

fractures and a traumatic brain injury.   (*Id.*)   Deputy Gerber documented the fall

in an Individual Rules Violation Report which stated in part:

IMMEDIATE ACTION TAKEN:        INMATE'S HEAD WAS BANDAGED

DETAILS OF INCIDENT:

ON 4/27/19, I AROUND 0015, I HEARD SOMEONE POUNDING ON THE F-BLOCK DOOR. I OPENED THE WINDOW COVERING AND INMATE PAAVILAINEN ADVISED THAT "DUDE FELL OFF OF HIS BUNK." I WENT INTO F-BLOCK AND OBSERVED INMATE ASGAARD LAYING ON THE GROUND HOLDING HIS HEAD WITH BLOOD COVERING HIS FACE, HEAD, AND THE FLOOR. I NOTIFIED THE CONTROL ROOM THAT INMATE ASGAARD FELL TO THE FLOOR AND THAT I WAS GOING TO NEED ASSISTANCE AND THE MEDICAL BAG. CPL. GLASS, DEPUTIES BODA AND WOOTKE RESPONDED. DEPUTY BODA AND I WRAPPED INMATE ASGAARD'S HEAD WITH GAUZE AS HE HAD A LACERATION NEAR HIS EYE AND ON HIS FOREHEAD. WE WERE ABLE TO ESCORT HIM UP TO THE BOOKING ROOM TO OBTAIN VITALS (BP: 156/84 P:78 SPO2: 89%). INMATE ASGAARD WAS VERY CONFUSED AS TO WHY HE WAS IN JAIL. HE WAS VERY CONCERNED ABOUT BEING IN TROUBLE AND KEPT QUESTIONING AS TO WHY HE WAS HERE. SGT. SPEAKER CALLED CENTRAL DISPATCH TO SEND EMS AT 0033 AND THEY ARRIVED AT 0040. INMATE ASGAARD WAS TAKEN TO MGH BY EMS AT 0047 AND CPL. GLASS WENT ALONG.

IT SHOULD BE NOTED THAT EARLIER IN THE NIGHT, INMATE ASGAARD WAS INQUIRING ABOUT MOVING TO INMATE REEVE'S BUNK. INMATE ASGAARD STATED HE HAS FALLEN BEFORE AND WANTED TO BE IN INMATE REEVE'S TOP BUNK AS IT WAS NEAR THE WALL. I SPOKE WITH INMATE ASGAARD AND ASKED HIM IF HE WOULD RATHER ME BRING A COT DOWN SO HE WAS ON THE GROUND. HE WAS VERY PERSISTENT IN NOT WANTING TO BE ON A COT. HE WANTED THE TOP BUNK BY THE WALL WHICH WOULD HAVE RESULTED IN MOVING AROUND THE ENTIRE BLOCK AS INMATE REEVES WANTED THE OTHER TOP BUNK BY THE WALL AND REFUSED TO GO IN INMATE ASGAARD'S BUNK... I THEN ASKED INMATE ASGAARD AN ADDITIONAL TIME IF HE WOULD LIKE A COT AND HE AGAIN SAID NO AND THAT HE WOULD BE FINE.

Officer's Signature: _____        Date: 4/27/19

04/27/2019 1:46 AM                Requested By: _____        Page 1   of 2

(ECF No. 29-1, PageID.212.)

After the fall, when Asgaard returned to the jail from the hospital, he slept on

a cot until his release from the jail.

### III.   Summary Judgment and Qualified Immunity Standard

Summary judgment is appropriate when the record reveals that there are no

genuine issues as to any material fact in dispute and the moving party is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of

Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).   The standard for determining whether

summary judgment is appropriate is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."   *State Farm Fire & Cas. Co. v. McGowan*,

421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986)).   The court must consider all pleadings, depositions, affidavits,

and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to

qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd, supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id*., at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).   This R&R will first address the deliberate indifference claim and arguments asserted by Defendants.

## IV.  Deliberate Indifference

Defendants Deputies Gerber, Boda, Giroux, and Dahlstrom argue that Asgaard cannot establish either the objective or subjective components of his deliberate indifference claim.   Because Asgaard was a pre-trial detainee, his claim is brought under the Fourteenth Amendment.   *Whitley v. Albers*, 475 U.S. 312, 327 (1986).   The Eighth Amendments protections extend to pre-trial detainees through the Fourteenth Amendment's Due Process Clause.   *Id.*   Until recently, the Eighth Amendment deliberate indifference objective and subjective standards applied to pre-trial detainees bringing medical care claims through the Fourteenth Amendment. In *Richmond v. Huq et al.*, 885 F.3d 928 (6th Cir. 2018), the Sixth Circuit reserved deciding whether, in the context of a failure to provide medical care, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), eliminated the requirement of proving the

9

subjective prong of the deliberate indifference test for pre-trial detainees under the Fourteenth Amendment.   In *Brawner v. Scott Cnty., Tennesee,* 14 F.4th at 585, 597 (6th Cir. 2021), the Sixth Circuit found that under the subjective component of the deliberate indifference analysis, a pre-trial detainee only needed to show recklessness – "more than negligence but less then subjective intent – something akin to reckless disregard."   *Id.* (citation omitted).

In *Greene v. Crawford County*, 20-1715/1741 (6th Cir., Jan. 4, 2022), the Sixth Circuit clarified that a pre-trial detainee establishes the subjective standard by showing a defendant either intentionally ignored a serious medical need or recklessly failed to act reasonably to mitigate the risk posed by a serious medical need.   *Id.* at slip op. 14.

To satisfy the objective component of a deliberate indifference claim the Eighth Amendment standard still applies.   A pre-trial detainee must allege that the medical need at issue is sufficiently serious.   *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In other words, the pre-trial detainee must show that he is incarcerated under conditions posing a substantial risk of serious harm.   *Id.*   "[A]n inmate who complains that ***delay in medical treatment*** rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."   *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted).   The Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's ***failure to treat a condition adequately***, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added).   Thus, *Napier* and *Blackmore* provide a framework for assessing a claim of delayed or inadequate care for a non-obvious condition:   A plaintiff making this type of claim must place verifying medical evidence in the record to show the detrimental effect of the delayed or inadequate treatment.

However, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person."   *Blackmore*, 390 F.3d at 899.

For a pre-trial detainee to survive summary judgment on a deliberate indifference claim he must "present evidence from which a reasonable jury could find that (1) that [the detainee] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serous medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to" the detainee."   *Green*, at slip op. 15, citing *Brawner*, 14 F.4th at 597.

## 1.  Objective component

Defendants first argue that Asgaard fails to establish that he had a "sufficiently serious" medical need that was so obvious that even a lay person

understood the need for treatment. (ECF No. 29, PageID.164.)   Defendants recognize that the Sixth Circuit has held that psychological injuries may be objectively serious.   *Comstock v. McCrary*, 273 F.3d. 693, 703 (6th Cir. 2001) (psychological needs are serious especially when they result in suicidal tendencies).

Defendants argue that accepting that Asgaard's "PTSD and depression are serious underlying psychological ailments, there is no evidence that his medical need for a lower bunk was so serious as to be obvious to a lay person."   ECF No. 29, PageID.166.)   Defendants cite *Robbins v. Black*, 351 Fed. Appx. 58 (6th Cir. 2009) as analogous authority for this argument.   In that case, Robbins sustained injuries when the plastic chair that he used to climb to his top bunk collapsed.   The Sixth Circuit concluded that Robbins failed to objectively show a medical need for a bottom bunk **because a medical doctor had determined** that he had no difficulty standing or ambulating despite his prior surgical history.   *Id.* at *3 (emphasis added).   The actual cause of Robbins injury was an accidental fall after the chair that he was standing upon collapsed, which had nothing to do with Robbins's medical condition.   *Id.*   Unlike, the facts in *Robbins*, Asgaard fell off the top bunk allegedly because he had a PTSD nightmare that caused him to thrash and roll out of his bunk, falling to the concrete floor below.   This is exactly the harm that Asgaard allegedly told the Deputies might occur if he was assigned to a top bunk.   Asgaard alleges that he informed each of the Deputies that he needed a bottom bunk due to his risk of fall from PTSD nightmares that cause him to thrash while asleep.   In *Comstock*, the Sixth Circuit stated "we have long held that prison officials who have been alerted to

12

a prisoner's serious medical needs are under an obligation to offer medical care to such prisoner.   273 F.3d at 702 (citing *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989) ("If a prisoner asks for and needs medical care, it must be supplied")). Although the records demonstrate that Asgaard provided medical information used to complete the jail intake form (ECF No. 29-2, PageID.237-41), the evidence does not include any indication that Asgaard was evaluated by medical staff before he received his top bunk sleeping assignment.

Defendants each claim that Asgaard never made a request for a bottom bunk. Asgaard says that he specifically made requests for a bottom bunk explaining he suffered with PTSD and nightmares that could cause him to fall from a top bunk and sustain injuries, but his request was ignored.   Asgaard testified that he made this request to each of the Deputy Defendants except Deputy Boda.[5]   (*See* ECF No. 29-3, PageID.262, 264 (Asgaard's testimony that he informed **Deputy Giroux** of his need for a bottom bunk); PageID.263 (Asgaard's testimony that he informed **Deputy Dahlstrom** of his need for a bottom bunk); PageID.265 (Asgaard's testimony that he informed **Deputy Gerber** of his need for a bottom bunk).)   In the opinion of the undersigned, a question of fact exists regarding whether Asgaard met the objective component of his Eighth Amendment claim by establishing that three of the Deputies

---

[5]   Additional analysis regarding Asgaard's statements to Deputy Boda will be reviewed in the section below, which discusses the subjective component of Asgaard's deliberate indifference claim.

– Giroux, Dahlstrom and Gerber – were aware of his medical need for a bottom bunk due to his mental health issues that caused PTSD and nightmares.[6]

### 2.  Subjective Component

Defendants deny that they were aware of Asgaard's PTSD and nightmares or that he had a medical need for a bottom bunk prior to his fall from the top bunk.

### A.  Deputy Giroux

Deputy Giroux argues that he was not working during the time that Asgaard says he informed Giroux of his need for a bottom bunk.   (ECF No. 29, PageID.169.) Deputy Giroux argues that, accepting Asgaard's allegations as true, his interaction with Asgaard was insufficient to allow him to draw an inference that Asgaard was at a risk of injury if he was assigned a top bunk.   (*Id*.)

Asgaard says that he spoke with Deputy Giroux about his PTSD and need for a bottom bunk before he fell from the top bunk.   (ECF No. 29-3, PageID.262.) Asgaard says that after he told Deputy Giroux that he needed a bottom bunk, Giroux simply responded that no one ever falls from their bunk:

---

[6]     Asgaard asserted at page 15 of his response brief that "Defendant Deputies had notice of Asgaard's tendency to thrash and fall in his sleep because Asgaard had fallen just two nights prior while in observation."   (ECF No. 33, PageID.340).   This is an important allegation, but Asgaard did not cite to the record or make any attempt to attribute knowledge of this fall to any Defendant.   A review of Asgaard's deposition shows that he testified that he fell off the slab he was sleeping on his first night in jail, in the observation cell, after he rolled off the slab while having a nightmare.   (ECF No. 33-2, PageID.362.)   Asgaard says he told one of the guards what had happened, but he did not name the guard who he allegedly spoke with. (*Id*., PageID.362-363.)

4   Q   All right.  So, let's talk about Deputy Giroux.  Did you

5       have a conversation with Deputy Giroux about having PTSD and

6       needing a bottom bunk?

7   A   Yes.

8   Q   What day did that happen?

9   A   Going down to the day that I was transferred on the

10      elevator.

11  Q   Transferred where?

12  A   To general population.

13  Q   Where you had the top bunk?

14  A   Yep.

15  Q   Okay.  So, are you saying that Deputy Giroux was the officer

16      who transferred you to the cell with the bunkbeds?

17  A   Yes, I believe so.

18  Q   All right.  So, where does that conversation occur?

19  A   In the elevator.

20  Q   Tell me how that conversation went.

21  A   I said, I'm having issues with PTSD, and so, I hope there's

22      a bunk, and if I -- that's it on the lower level, because if

23      I go on top bunk, I'll fall.

. . . .

6   Q   What did Giroux say in response to your comment about hoping

7       for a bottom bunk?

8   A   He said, I've been here 20 years, and nobody's ever -- and

9       many people have said before that they're going to fall, and

10      they have PTSD, but nobody ever does.

11  Q   Okay.  Did he say anything else?

12  A   Not that I remember.

13  Q   Did Deputy Giroux walk you to your bunk?

14  A   I'm not sure about that.  I know he was the one, he was

15      helping me.

(*Id.*, PageID.264.)

Deputy Giroux denies that this conversation took place, but argues that even

if it is true, he could not have drawn the inference that Asgaard would fall from a top

bunk due to his PTSD.   The problem with this argument is that Asgaard says that he told Deputy Giroux that he would fall from a top bunk because of his PTSD. Deputy Giroux allegedly acknowledged what Asgaard told him by responding that other prisoners have said they would fall due to PTSD but "nobody ever does."   If that is true, then Deputy Giroux clearly made the inference that Asgaard could fall but believed he would not because no one had fallen due to a claim of PTSD in the past.   In the opinion of the undersigned a question of fact exists regarding whether Deputy Giroux was told by Asgaard that he would fall due to PTSD and whether he intentionally ignored the request for a bottom bunk or at least recklessly disregarded the risk of harm to Asgaard.

### B.   Deputy Dahlstrom

Deputy Dahlstrom argues that she was not working at the time Asgaard says he told her he needed a bottom bunk due to PTSD and nightmares. (ECF No. 29, PageID.170.)   Deputy Dahlstrom also argues that she could not have had a culpable state of mind based upon the interaction described by Asgaard.   (*Id*.)   Asgaard says that when he told Deputy Dahlstrom that he would fall from the top bunk, she responded by stating no one was moving and there was nothing that she could do.

```
21   Q   So you were sitting on the top bunk?
22   A   Yes.
23   Q   And where was Ms. Dahlstrom?
24   A   Standing up to my left.
25   Q   Tell me the substance of the conversation that you had.
```

Page 48

```
 1   A   I said, I have PTSD and I thrash around, and I'm going to
 2       fall, I already fell once when I was upstairs in
 3       observation, and that the news is on, the national news, and
 4       the ship that I was on, the exact same ship, the USS Abraham
 5       Lincoln, was in the exact same place, doing the same mission
 6       that I was, on that day and the day before, and I said, so
 7       I'm -- it's a big, big time trigger for me, and I'm having
 8       an issue with nightmares and night terrors, and I'm going to
 9       fall and I need to be transferred to a bottom bunk.  And she
10       said, nobody's moving, you know, there's nothing I can do,
11       and I know you've been asking all night, nobody's moving,
12       plain and simple.
13   Q   You don't recall what time of day that happened?
14   A   It was in -- not the specific time, because when you're in
15       jail, you don't know what time it is.  There's -- I mean,
16       half the time you don't -- You have to pick up the phone and
17       just figure out what time it is, so, no, I don't know.
```

(ECF No. 29-3, PageID.263.)

In the opinion of the undersigned, a question of fact exists whether Asgaard had this conversation with Deputy Dahlstrom and whether Deputy Dahlstrom intentionally ignored the request for a bottom bunk or recklessly disregarded the risk of harm to Asgaard.

### C.  Deputy Boda

Deputy Boda testified that Asgaard never spoke to her about needing a bottom bunk prior to his fall.   (ECF No. 29-5, PageID.294 (deposition of Deputy Boda).) Deputy Boda states that she does not recall having any "observations of Mr. Asgaard prior to him falling".   (*Id*.)   Asgaard says that he told Deputy Boda that he needed a bottom bunk as she walked past him, but she did not respond.   Asgaard concedes that Deputy Boda may have not heard his request.   Asgaard testified:

16    Q    Deputy Anne Bode, do you recall speaking with Deputy Bode
17         about having PTSD, nightmares, or needing a bottom bunk,
18         prior to falling?
19    A    Yes.
20    Q    When did that happen?
21    A    Sometime during after I was transferred.
22    Q    After you were transferred to the cell with the bunkbeds?
23    A    Yes.
24    Q    Okay.  What time of day did you have that conversation?
25    A    I'm not sure exactly.

Page 52

1     Q    Where did you have the conversation at?
2     A    In the general population.  I don't know what -- I don't
3          know the name of the -- general pop, they call it.  They
4          call it general population.
5     Q    What was discussed?
6     A    I said I can't be up here.  I told the other guards, and I'm
7          having issues with night terrors and thrash around, and I'm
8          going to fall.  She didn't say anything.  She just kept
9          walking, just walked by, just ignored me.
10    Q    Are you certain that she heard what you said?
11    A    I don't know.
12    Q    You don't know whether she heard you one way or another,
13         right?
14    A    Can't be certain.

(ECF No. 29-3, PageID.264.)

Asgaard says he "can't be certain" that Deputy Boda heard him when he said

he would fall from his top bunk while she was walking by him.   Deputy Boda says

that Asgaard never told her he needed a bottom bunk.    At best, Asgaard is

speculating that maybe Deputy Boda heard him and ignored him.    But there exists

no evidence to support that claim.   Deputy Boda says Asgaard never spoke to her

about his need for a bottom bunk and Asgaard concedes that when he mentioned he could fall off his top bunk, as Deputy Boda was walking by, she may not have heard him.   Under these facts, it is opinion of the undersigned, that Asgaard's factual assertion that he is unsure whether Deputy Boda heard him when he made the statement that he would fall from his top bunk is insufficient to establish that Deputy Boda acted with deliberate indifference toward Asgaard's need for a bottom bunk.

### D.  Deputy Gerber

Deputy Gerber argues that after Asgaard told her about his concerns she contacted a sergeant who advised her to offer Asgaard a cot.   (ECF No. 29-4, PageID.287.)   Deputy Gerber states that Asgaard refused to move to a cot.   (*Id*.) Asgaard states that Deputy Gerber never offered to move him to a cot on the floor. Asgaard testified:

7   Q   In any event, you recalled saying, I need a -- I have PTSD,
8       I'm worried about falling out of bed, I need a bottom bunk?
9   A   Yes.
10  Q   And at some point, didn't you also say, can I have a top
11      bunk that's against the wall?
12  A   I said, if I can't have a bottom bunk, how about the one
13      against the wall that will cut my fall chances way down,
14      because there's only one -- there's only one other way to
15      fall.  So, if you thrash, you could thrash against the wall,
16      or you could thrash in a fall.
17  Q   What were you told as to that request?
18  A   Nobody's moving.  The lieutenant said nobody's moving,
19      nobody's moving.  That was what they all said.
20  Q   So, you understand, Mr. Asgaard, Gerber has indicated both
21      in his report and under oath, that she offered you a cot
22      more than one time.  Are you aware that's what her testimony
23      was?
24  A   Yes.
25  Q   And do you recall her offering you a cot?

1   A   No, that did not happen.
2   Q   Are you saying that she's lying?
3   A   I'm saying she did not offer me a cot.  That's --
4   Q   You heard her testifying, you read her report, correct?
5   A   Yes.
6   Q   And if she said she offered you a cot, are you saying that
7       she's a liar, that that never happened?
8   A   I'm saying that did not happen.  I don't know how to answer
9       that, labeling anybody as anything.  I'm saying the facts
10      are, she did not say that to me.  I wasn't offered a cot.

(ECF No. 29-3, PageID.265.)

In the opinion of the undersigned a question of fact exists regarding whether

Deputy Gerber offered Asgaard a cot to accommodate his concerns and whether

Deputy Gerber lacked deliberate indifference through her actions toward Asgaard. Deputy Gerber says that she offered Asgaard a cot and Asgaard says that he was not offered a cot.   It was not until after Asgaard fell from his top bunk that Deputy Gerber first documented that she had offered Asgaard a cot.   (ECF No. 29-1, PageID.212.)   This comes down to a credibility issue and the Court may not resolve credibility issues on a motion for summary judgment.

## V.   Qualified Immunity Analysis

Defendants argue that they are entitled to qualified immunity because there exists no clearly established law to support a claim that an individual with psychological symptoms such as PTSD and a risk of fall suffers with a serious medical need.   (ECF No. 29, PageID.171.)   Defendants also argue that the since the legal standard for pre-trial detainees recently changed to a recklessness standard, that standard was not clearly established law at the time of Asgaard's fall in the jail.   (*Id.*, PageID.164, n. 1.)

As Defendants recognize, it is well established that inmates including pre-trial detainees are entitled to medical care – including mental health care.   *Comstock*, 273 F.3d at 703.   Defendants' argument that there exists no clearly established law that an inmate with PTSD could fall off a top bunk is not the standard for qualified immunity, because the case law does not require facts directly on point.   *White*, 137 S. Ct. at 551.   The operation of the qualified immunity standard depends substantially upon the level of generality at which the relevant legal rule is to be identified.

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987).

The immunity issue should not be resolved if there are factual disputes on which the issue of immunity turns such that it cannot be determined before trial whether the defendants' conduct violated clearly established rights.   *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991).   In the opinion of the undersigned, a question of fact exists whether Deputies Giroux, Dahlstrom, and Gerber had knowledge of the risk of harm to Asgaard and failed to take corrective actions to reduce or eliminate that harm.

As to Deputy Boda, there exists no evidence that she had knowledge of Asgaard's concern that his PTSD and nightmares could cause him to roll of his top bunk.   As stated above, Asgaard concedes that Deputy Boda may not have heard him and that he never actually had a conversation with her regarding his concerns.   In the opinion of the undersigned, Deputy Boda is entitled to qualified immunity because Asgaard had failed to establish that Deputy Boda had knowledge of a risk of harm and disregarded that risk.

Defendants argue that the recklessness standard under the subjective component was not clearly established in 2017 at time that Asgaard fell and sustained injuries, entitling them to qualified immunity.   It is not the legal standard that the Court applies that determines clearly established law.   The clearly

established law is based upon the alleged violation of an established right. *Anderson*, 483 U.S.at 639-40.   In this case, it is the failure to address a potential risk of harm caused by Asgaard's PTSD and nightmares.   As stated, it was clearly established and undisputed that a pre-trial detainee has a right to mental health care treatment.   *Comstock*, 273 F.3d at 703.   Moreover, the United States Supreme Court decided *Kingsley* in 2015, which put officers on notice that the legal standards applicable to pre-trial detainees under the Fourteenth Amendment were different than the Eighth Amendment standards applicable to convicted prisoners.   *Kingsley*, 576 U.S. at 400 ("The language of the two Clauses differ, and the nature of the claims often differs.   And, most importantly, pre-trial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'")[7]

In the opinion of the undersigned, Deputy Boda is entitled to qualified immunity because no genuine issue of fact exists that could establish that she ignored or disregarded a known risk of harm to Asgaard.   It is recommended that the Court deny qualified immunity to Deputies Giroux, Dahlstrom, and Gerber because a genuine issue of material fact exists based upon Asgaard's allegations that these Deputies disregarded a known risk of harm to Asgaard.

## VII.   Marquette County

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities could be subject to Section 1983

---

[7]   The Sixth Circuit in Greene applied the recklessness standard to allegations that the officers were deliberately indifferent to a pre-trial trainee in 2017.   *Greene*, slip op at 5-10

actions for alleged constitutional violations, albeit in a narrow set of circumstances. "A municipality may not be held liable under § 1983 on a *respondeat superior* theory – in other words, '*solely* because it employs a tortfeasor.'"   *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691 (emphasis in original)).   Instead, a municipality may only be liable under § 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35-37 (2010) (citing *Monell*, 436 U.S. at 694 (1974)).

In a municipal liability claim, the finding of a policy or custom is the initial determination to be made.   *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity and show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving,* 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508–509.

Asgaard asserts that the Marquette County Jail has a policy of assigning bunks to pre-trial detainees without considering their medical condition.   (ECF No. 1, PageID.5 (paragraph 28 of the original complaint).)   Asgaard repeats this assertion in his response to the motion for summary judgment.   (ECF No. 33, PageID.348 ("Marquette County arbitrarily assigns bunks with no discretion regarding an inmate's medical history.").)   Asgaard has presented no evidence to support that assertion.   The jail takes into account the medical and mental health

history of an individual during the booking process.   Marquette County uses a Jail Inmate Intake Form that requires the intake officer to ask a series of medical questions, including questions about mental health care needs.   (ECF No. 29-2, PageID.237-241.)   Asgaard indicated that he had PTSD (*see id.*, PageID.239) but did not indicate during the booking process that his PTSD and nightmares placed him at risk for falling out of his bunk.   (*Id.* at PageID.240.)   But more importantly, his statement regarding the absence of any consideration of medical conditions when assigning bunks makes no sense.   Common sense leads one to conclude that a Deputy would place an elderly inmate or a disabled inmate in a lower bunk or provide some other type of accommodation.   Asgaard could have explored these possibilities in discovery.   And if he had done so, he would know whether bunk assignment is really arbitrary.   Here, he has simply gone too far in asserting that the County has an arbitrary policy of bunk assignments simply because he was denied an upper bunk.

In the opinion of the undersigned, Marquette County should be dismissed from this action because Asgaard has failed to establish that the County had a custom, policy, or procedure that led to his upper bunk assignment.

## VIII.   Gross Negligence Conduct

Defendants argue that Asgaard's gross negligence claim should be dismissed because they did not act with recklessness and Asgaard failed to show that he had a serious need for a lower bunk.   Under Michigan law officers employed by a governmental agency are entitled to immunity from tort liability when acting in the

26

scope of employment and the officer's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage."   Mich. Comp. Laws § 691.1407(2)(a)-(c).   Gross negligence is defined in the statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."   Mich. Comp. Laws §691.1407(8)(a).

For the same reasons that it is recommended that Asgaard's Fourteenth Amendment claim should proceed against Deputies Giroux, Dahlstrom, and Gerber – that there exists a genuine issue of material fact regarding whether they acted intentionally or recklessly in disregarding a known risk of harm to Asgaard – it is recommended that the Court find that a genuine issue of fact exists regarding whether that conduct rose to the level of gross negligence that was the proximate cause of his injuries.

## IX.   Recommendation

It is respectfully recommended that the Court grant Defendants' motion for summary judgment in part and deny it in part as follows:

(1) grant the motion by dismissing Deputy Boda and Marquette County, and

(2) deny the motion as to Deputies Giroux, Dahlstrom, and Gerber.

If the Court accepts this recommendation the remaining claims will include a Fourteenth Amendment deliberate indifference claim and a gross negligence claim against Defendants Giroux, Dahlstrom, and Gerber.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen

(14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C);

Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections

constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638

F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:     January 31, 2022                            /s/ *Maarten Vermaat*
                                                       MAARTEN VERMAAT
                                                       U.S. MAGISTRATE JUDGE